NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

JAN 7 2022

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 20-10378 |
| Plaintiff-Appellee, | D.C. Nos.<br>3:18-cr-00310-EMC-1 |
| v. | 3:18-cr-00310-EMC |
| LAWRENCE J. GERRANS, AKA Larry Gerrans, | MEMORANDUM* |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted October 19, 2021
San Francisco, California

Before: WATFORD and HURWITZ, Circuit Judges, and BAKER,** International
Trade Judge.
Partial Concurrence and Partial Dissent by Judge BAKER.

Lawrence Gerrans challenges his convictions and sentence for six counts of

financial crimes (wire fraud and money laundering), three counts of making false

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable M. Miller Baker, Judge for the United States Court of
International Trade, sitting by designation.

statements to the FBI, and three counts of post-release misconduct (contempt of court, witness intimidation, and obstruction of justice). We affirm.

**1.** The government introduced sufficient evidence to support the false statement convictions (Counts 7–9). Chris Gerrans testified that Gerrans instructed him to create the Halo invoices, dated January through March 2010, years after Gerrans and his wife supposedly completed work for Sanovas. However, signed statements that the couple submitted during their bankruptcy proceedings indicated that, as of April 2010, Sanovas was not a source of income for them. Considering the contradiction between those statements and the Halo invoices, as well as the unusual circumstances under which Chris created the invoices, a rational jury could infer that the invoices were falsified.

Regarding the March 2015 promissory note from Gerrans to Hartford Legend, the government's evidence established that no such loan was recorded on the house's title. The government also introduced evidence establishing that when Gerrans applied for a mortgage on the house in December 2015, his submissions to the bank indicated that there were no open loans against the property. A rational jury could infer from this evidence, and the fact that Hartford Legend was established in February 2015 and never filed any tax returns, that the promissory note did not reflect a real loan and thus had been falsified.

Based on all of the evidence presented at trial, a rational jury could also conclude that Gerrans acted knowingly and deliberately when he presented the falsified invoices and promissory note to the FBI during its 2017 investigation.

**2.** The government introduced sufficient evidence to support the post-release misconduct convictions (Counts 10–12). The jury was entitled to credit testimony from Chris Gerrans and Ryan Swisher about the argument at the storage facility, which both witnesses characterized as being about Gerrans's criminal proceedings. Both witnesses also described Gerrans's physical aggression toward his brother, and a rational jury could have inferred from their accounts that Gerrans was acting with an intent to influence Chris's testimony. Moreover, the three post-release misconduct counts were predicated on more than just the storage facility incident. Chris Gerrans also testified about other conversations in which Gerrans raised the charges pending against him, and the government introduced the burner phone that Gerrans gave to Chris to facilitate clandestine communications between them after the district court had ordered Gerrans not to discuss the case with Chris.

**3.** We agree with the district court that our decision in *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020), does not require a new trial on the financial crimes (Counts 1–6). Because Gerrans did not object to the challenged intent instruction during trial, we review only for plain error. *See United States v. Moreland*, 622 F.3d 1147, 1165–66 (9th Cir. 2010). The erroneous intent

instruction did not affect Gerrans's substantial rights for the same reason it did not warrant a new trial in *Miller*:  The error was rendered harmless by another instruction requiring the jury to find that Gerrans knowingly engaged in a scheme to defraud or obtain money or property by dishonest means.  *See Miller*, 953 F.3d at 1101–03.  That second instruction ensured that the jury would not have convicted Gerrans of wire fraud unless it found that he intentionally cheated Sanovas of funds.

Gerrans argues that his lawyer failed to present evidence showing that he believed he was entitled to the money he took from Sanovas.  Those arguments, while relevant to his ineffective assistance of counsel claims, do not show that the jury could have convicted Gerrans without finding that he intended to cheat.

**4.**  We decline to resolve Gerrans's claims for ineffective assistance of counsel.  The record as it stands now does not contain evidence establishing that his trial counsel's performance fell below an objectively reasonable standard or that Gerrans was prejudiced by any alleged deficiency.  *See Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984).  We therefore adhere to our usual practice of deferring resolution of these claims until post-conviction proceedings.  *See United States v. Lillard*, 354 F.3d 850, 856 (9th Cir. 2003).  Nothing in our decision precludes Gerrans from conducting additional investigation and asserting his ineffective assistance claims in a 28 U.S.C. § 2255 motion.

**5.** The district court did not err in rejecting Gerrans's claims of prosecutorial misconduct. Gerrans has not identified any evidence introduced at trial, or any statement made by the government, that was actually false. *See United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). The May 2013 email showing that Sanovas's then-CFO approved certain expenses on the corporate credit card does not directly contradict any aspect of Lloyd Yarborough's testimony about his own analysis of Gerrans's expenses. Gerrans's evidence does not render false the board members' testimony that they never received Gerrans's existing employment agreement. The same is true of the board members' testimony that they would not have approved the restated employment agreement had they known about the money Gerrans had already taken. As noted above, Chris Gerrans's testimony regarding the storage facility altercation was supported, not contradicted, by Swisher's testimony. Finally, given the evidence introduced at trial, there was nothing inappropriate about the government's portrayal of Gerrans, Halo, and Hartford Legend in its closing argument. Nor did the government mislead the jury by stating that co-founder Erhan Gunday's departure from Sanovas did not trigger a payout for Gerrans.

**6.** The district court correctly calculated the applicable Sentencing Guidelines range. The Guidelines required the court to group the post-release misconduct counts with the underlying wire fraud and money laundering counts

before determining the group offense level. *See* U.S.S.G. §§ 3D1.1, 3C1.1 cmt. n.8. The court then properly applied the three-level enhancement for crimes committed while on release to the group offense level. *See* U.S.S.G. § 3C1.3.

**7.** For the reasons stated above, we affirm Gerrans's convictions and sentence. We decline to rule on his ineffective assistance of counsel claims.

**AFFIRMED.**

*United States of America v. Lawrence J. Gerrans*, No. 20-10378


BAKER, Judge, concurring in part and dissenting in part:

I join Parts 1, 2, 5, and 6 of the memorandum disposition. But I respectfully dissent as to: (i) Gerrans's ineffective assistance of counsel challenge to his convictions under Counts 1–6 (wire fraud and money laundering) and 10–12 (contempt, witness tampering, and obstruction of justice), and (ii) Gerrans's jury instruction challenge to his convictions under Counts 1–6. With regard to those charges, I would vacate Gerrans's convictions and remand for a new trial.

**1.** The majority correctly observes that ineffective assistance claims are normally resolved through a subsequent collateral proceeding brought under 28 U.S.C. § 2255. *Ante* at 5 (citing *United States v. Lillard*, 354 F.3d 850, 856 (9th Cir. 2003)). But this is not always necessary; in some cases, the record is sufficiently developed that an appellate court can decide the issue on direct appeal. *See United States v. Alferahin*, 433 F.3d 1148, 1160 n.6 (9th Cir. 2006). I think this is one such case, and that both judicial economy and fairness to Gerrans support lancing this boil now.

Trial counsel is "typically afforded leeway in making tactical decisions regarding trial strategy." *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) (citing *Riley v. Payne*, 352 F.3d 1313, 1324 (9th Cir. 2003)). But "counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision." *Id.* (citing *Riley*, 352 F.3d at 1324).

Here, because Gerrans's trial counsel never bothered to interview several key witnesses, he could not possibly have made professionally responsible decisions regarding which witnesses to call and which evidence to introduce. According to the declaration of Gerrans's post-trial counsel, who reviewed the relevant records, trial counsel never interviewed Sanovas's CFO Farrell, whose emails established that Gerrans's expense reimbursements were authorized, and who calculated that the company owed Gerrans over $700,000 in deferred compensation. Nor did Gerrans's trial counsel interview the attorneys at King & Spalding, who specifically advised Gerrans that he would face steep tax penalties if he delayed in taking the money due to him under his deferred compensation arrangement. As Gerrans's only defense to the wire fraud charges against him was that he thought he was entitled to the receipt of the funds in question, trial counsel's failure to at least interview Farrell and the King & Spalding attorneys was inexcusable, as those witnesses might have vouched for his defense.

As if that weren't bad enough, trial counsel also inexcusably failed to interview Swisher and Huante, the two witnesses to the confrontation between Gerrans and his brother Chris that undergirds the contempt, witness tampering, and obstruction of justice charges. Again, these witnesses might have vouched for Gerrans's defense at trial, and to make a professional judgment about whether to call

them, counsel needed to interview them.[1]

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). "A lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance." *Reynoso*, 462 F.3d at 1112 (quoting *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) (brackets in *Lord*)). In that same vein, we have held that "[f]ailure to investigate possible exculpatory witnesses can be ineffective assistance." *United States v. Mendoza*, 107 F.3d 878, 1997 WL 97279, at *1 (9th Cir. Mar. 4, 1997) (citing *Sanders v. Ratelle*, 21 F.3d 1446, 1456–58, 1461 (9th Cir. 1994)); *see also United States v. Tucker,* 716 F.2d 576, 583 (9th Cir. 1983) (failure to even attempt to interview key prosecution witnesses constitutes deficient performance).

Here, there is simply no conceivable tactical justification for defense counsel's flagrant abdication of the duty to fully prepare. *See Riley*, 352 F.3d at 1318–19. Since the failure to interview many critical witnesses in connection with

---

[1] Gerrans also argues that "there is no evidence" that his trial counsel sought to interview the Sanovas Board members, but on this record neither is there any evidence to the contrary, and therefore I do not rely on this argument.

Counts 1–6 and 10–12 is so glaring,[2] I do not think we need to wait for Gerrans to develop a separate record through a 28 U.S.C. § 2255 motion. *Riley*, 352 F.3d at 1319–20. In my view, these "multiple deficiencies have the cumulative effect of denying a fair trial" to Gerrans as to those counts. *Ewing v. Williams*, 596 F.2d 391, 396 (9th Cir. 1979).[3]

**2.** The majority acknowledges that as to the wire fraud charges (Counts 1–5), the intent element of the jury instruction was erroneous under *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020), and *Shaw v. United States*, 137 S. Ct. 462 (2016), because it allowed the jury to convict if it determined that Gerrans merely meant to "deceive" rather than "cheat." *Ante* at 4. Nevertheless, the majority concludes—as

---

[2] Gerrans has not identified any critical witnesses that trial counsel failed to interview in connection with Counts 7–9.

[3] Trial counsel's abject failure to interview key witnesses standing alone warrants a new trial in connection with Counts 1–6 and 10–12, but unfortunately for Gerrans, his counsel dug an even deeper hole at trial by failing to put on any affirmative defense in connection with any of the charges against him. As a result, the jury never learned of various potentially exculpatory documents, such as the email from Farrell authorizing the challenged reimbursements, the memorandum from Farrell outlining the deferred compensation owed to Gerrans, the email from the King & Spalding attorneys advising him to take the deferred compensation to avoid tax penalties, an accounting firm's report detailing the money owed to Gerrans, and Gerrans's employment agreement authorizing a loan to him to purchase a home. Nevertheless, unlike the failure to interview critical witnesses—which seems to me patently unreasonable in these circumstances—trial counsel's highly suspect failure to put on any affirmative defense is better suited for resolution in a subsequent collateral proceeding.

in *Miller*, which involved the same Ninth Circuit pattern jury instruction[4]—that this error was rendered harmless by "another instruction requiring the jury to find that Gerrans knowingly engaged in a scheme to defraud *or* obtain money or property by dishonest means." *Ante* at 4 (citing *Miller*, 953 F.3d at 1101–03) (emphasis added).[5] And so, the majority reasons, "[t]hat second instruction ensured that the jury would not have convicted Gerrans of wire fraud unless it found that he intentionally cheated Sanovas of funds." *Id*.

 *Miller*, however, relied not only on the other language in the pattern jury instruction to find harmless error, but also on, *inter alia*, the jury's conviction of Miller on related tax fraud charges, because that conviction foreclosed "any notion that the jury thought that Miller was guilty of deception, but not cheating." 953 F.3d at 1103. Here, there were no related charges (and convictions) that might be said to establish that the jury found Gerrans guilty of cheating rather than mere deception. Because *Miller*'s harmless error analysis does not apply here, we should reverse and remand for a new trial as to Counts 1–5.[6]

---

[4] *Manual of Modern Criminal Jury Instructions for the District Courts of the Ninth Circuit* § 8.124 (2019).

[5] I emphasize the disjunctive "or" in the quoted passage for the reasons explained below.

[6] Reversal and remand for a new trial as to Counts 1–5 would also necessarily require reversal and remand for Gerrans's conviction under Count 6 for money laundering

In any event, if *Miller* stands for the proposition that the majority ascribes to it—that the quoted language renders the jury instruction's error on the intent element essentially *per se* harmless—then I respectfully submit that *Miller* (while binding on us) itself is in error.

The pattern jury instruction used both in *Miller* and here provided that the defendant was charged with "wire fraud in violation of Section 1343 of Title 18 of the United States Code," and that for

> the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, *the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, **or** a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts*. Deceitful statements of halftruths may constitute false or fraudulent representations;
>
> Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;
>
> Third, the defendant *acted with the intent to defraud, that is, the intent to deceive or cheat*; and
>
> Fourth, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

(emphasis added).

---

in violation of 18 U.S.C. § 1957, as the government conceded at argument that Gerrans's convictions under Counts 1–5 and 6 rise and fall together.

Critically, the pattern jury instruction's first element, which contains the language invoked by *Miller* and the majority—is disjunctive: "the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, *or* a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts." Although the second part of that formulation—"a scheme or plan for obtaining money or property by means of false or fraudulent [actions]"—necessarily implies intent to obtain money or property via deceptive means (and thus cheat), the first part—"a scheme or plan *to defraud*"—does not, because the instruction's third element defines "intent to defraud" as "the intent to deceive *or* cheat." In short, the first part of the disjunctive first element of the pattern jury instruction relied on by the majority to salvage Gerrans's wire fraud convictions necessarily incorporates the erroneous intent standard of the instruction's third element.

Applied here, that means the jury might have concluded that Gerrans "knowingly participated in, devised, or intended to devise a scheme or plan to defraud" with the intent to "deceive" but *without* the intent to "cheat" Sanovas—a standard at odds with the Supreme Court's decision in *Shaw*. *See* 137 S. Ct. at 469 (wire fraud jury instruction was erroneous insofar as it "could be understood as permitting the jury to find [the defendant] guilty if it found no more than that his scheme was one to deceive the bank but not to '*deprive*' the bank of anything of

value") (emphasis in original). Thus, insofar as *Miller* is read as the majority does, it conflicts with *Shaw*, under which "wire fraud requires the intent to deceive *and* cheat—in other words, to deprive the victim of money or property by means of deception." *Miller*, 953 F.3d at 1103 (emphasis in original).

\* \* \*

For the reasons above, I concur in part and respectfully dissent in part.